**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

AUTO-OWNERS INSURANCE COMPANY,

    Plaintiff,

v.

    Case No. 3:17-cv-817-J-34PDB

ENVIRONMENTAL HOUSE WRAP, INC.,[1]
and BISCAYNE BAY HOMEOWNERS
ASSOCIATION, INC.,

    Defendants.
_____/

## ORDER

**THIS CAUSE** is before the Court on cross-motions for summary judgment as to Plaintiff Auto-Owners Insurance Company's (Auto-Owners) duty to defend CalAtlantic Group, Inc. (CalAtlantic) in an underlying state court action initiated by Defendant Biscayne Bay Homeowners Association, Inc. (Biscayne Bay). See Defendant CalAtlantic Group, Inc.'s Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 44; CalAtlantic's Motion); Defendant Biscayne Bay Homeowners Association, Inc.'s Motion for Partial Summary Judgment Against Auto-Owners Insurance Company and Memorandum of Law in Support Thereof (Doc. 46; Biscayne Bay's Motion); Auto-Owners Insurance Company's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 47; Auto-Owners' Motion), each filed on December 14, 2018. The parties filed their respective responses on January 7, 2019. See Defendant CalAtlantic Group, Inc.'s Memorandum in Opposition to Plaintiff Auto-Owners Insurance Company's Motion for

---

[1] Environmental House Wrap, Inc. (Environmental) has not appeared despite service of process, see Return of Service (Doc. 12; filed October 25, 2017), and the Clerk of Court has entered default against it, see Clerk's Entry of Default (Doc. 14; filed October 27, 2017).

Summary Judgment (Doc. 53; CalAtlantic's Response to Auto-Owners' Motion); Auto-Owners Insurance Company's Response in Opposition to Biscayne Bay Homeowners Association, Inc.'s Motion for Partial Summary Judgment and Incorporated Memorandum of Law (Doc. 54; Auto-Owners' Response to Biscayne Bay's Motion); Auto-Owners Insurance Company's Response in Opposition to the Ryland Group, Inc.'s Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 55; Auto-Owners' Response to CalAtlantic's Motion); Defendant Biscayne Bay Homeowners Association, Inc.'s Response in Opposition to Plaintiff Auto-Owners Insurance Company's Motion for Summary Judgment (Doc. 56; Biscayne Bay's Response to Auto-Owners' Motion).

In their Motions, the parties also moved for summary judgment on the issue of Auto-Owners' duty to defend Environmental. However, at a motion hearing held on April 22, 2019, the Court denied Auto-Owners' Motion to the extent Auto-Owners sought a declaration that it did not have a duty to defend Environmental in the underlying state court action, and in turn granted CalAtlantic and Biscayne Bay's Motions to the extent the Court declared that "Auto-Owners has a duty to defend and must defend Environmental against the claims alleged in the underlying state court action[.]" See Order (Doc. 76). In light of new arguments raised by Auto-Owners at the hearing, the Court took the Motions under advisement to the extent they sought declarations regarding Auto-Owners' duty to defend CalAtlantic. Id. The Court directed the parties to submit additional briefing "limited to the duty to defend CalAtlantic for damages that may have occurred before the operations were completed but were not identified until after the completion of the project[,]" id., which they have since done. See Auto-Owners Insurance Company's Supplemental Brief on the Products-Completed Operations Exclusion (Doc. 81; Auto-Owners' Supplemental Brief);

Defendant Biscayne Bay Homeowners Association, Inc.'s Response to Auto-Owners Insurance Company's Supplemental Brief on the Products-Completed Operations Hazard Exclusion (Doc. 83; Biscayne Bay's Supplemental Brief). Accordingly, the remaining issue of whether Auto-Owners had a duty to defend CalAtlantic in the underlying state court action is ripe for review.

**I.    Background**[2]

This insurance coverage dispute arises out of a lawsuit filed in state court on May 20, 2016, by Biscayne Bay regarding the construction and development of a 24-townhome community known as the Biscayne Bay Townhomes in Jacksonville, Florida (the Project). See Biscayne Bay Homeowners Ass'n, Inc. v. Evergreen Visibility, LLC, Case No. 2016-CA-3462 (Fla. 4th Cir. Ct. 2016) (Underlying Lawsuit).[3] Biscayne Bay, which is the homeowners association responsible for the maintenance of the townhomes, sued CalAtlantic and Environmental, along with more than 30 other defendants, in state court for damages caused by alleged defects in the construction of the Project. See id. On July 18, 2017, Auto-Owners initiated the instant action for declaratory judgment, seeking a declaration that it is not obligated to defend or indemnify Environmental or CalAtlantic in the Underlying Lawsuit.[4] See Complaint for Declaratory Relief (Doc. 1).

---

[2] Because this case is before the Court on cross-motions for summary judgment, the Court will, when addressing the merits of the party's motions, view the facts presented in the light most favorable to the party or parties opposing summary judgment. The Court will so note its perspective when appropriate. The facts recited in this section are either undisputed, or any disagreement has been indicated. See T-Mobile South LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

[3] The Court takes judicial notice of the state court proceedings in their entirety. See Fed. R. Evid. 201.

[4] At the April 22, 2019 hearing, the Court granted Biscayne Bay and CalAtlantic's joint motion to stay the issue of Auto-Owners' duty to indemnify. See Order.

On April 19, 2019, Biscayne Bay and CalAtlantic notified the Court that they had settled their claims in the Underlying Lawsuit, and that "[t]he settlement included an assignment of . . . CalAtlantic's rights, claims, and interests for additional insured coverage under the subject Auto-Owners policy." See Biscayne Bay Homeowners Association, Inc.'s and CalAtlantic Group, Inc.'s Joint Motion to Substitute (Doc. 74; Motion to Substitute). At Biscayne Bay and CalAtlantic's request, and without objection by Auto-Owners,[5] the Court directed the Clerk of Court to substitute Biscayne Bay, as assignee of CalAtlantic, as Defendant in place of CalAtlantic. See Endorsed Order Granting Motion to Substitute (Doc. 82; May 6, 2019). Thus, the only parties still actively litigating this case are Auto-Owners and Biscayne Bay.

### A. The Allegations of the Underlying Complaint

For purposes of determining whether Auto-Owners had a duty to defend CalAtlantic in the Underlying Lawsuit before the parties settled, the operative complaint is Biscayne Bay's Third Amended Complaint, filed on September 14, 2018.[6] See Auto-Owners' Motion, Ex. A: Third Amended Complaint (Doc. 47-1; Underlying Complaint). According to the

---

[5] In its response to the Motion to Substitute, Auto-Owners stated that it did "not oppose the procedural substitution of [Biscayne Bay], as assignee of CalAtlantic." See Auto-Owners Insurance Company's Response to the Association and CalAtlantic's Joint Motion to Substitute (Doc. 78) at 1. However, Auto-Owners also noted that it did "not agree that such substitution grants [Biscayne Bay] any substantive rights[,]" id. at 2, and that by consenting to the substitution, Auto-Owners was not waiving "any rights or defenses related to the validity or enforceability of the assignment or settlement agreement[,]" id. at 3.

[6] The Court notes that after settling with CalAtlantic and absorbing CalAtlantic's third-party claims against various state court defendants, Biscayne Bay filed a fourth amended complaint in the Underlying Lawsuit. In identifying the third amended complaint as the operative pleading, the Court recognizes that ordinarily "[c]overage is determined from examining the most recent amended pleading, not the original pleading." Trailer Bridge, Inc. v. Illinois Nat. Ins. Co., 657 F.3d 1135, 1142 (11th Cir. 2011). However, because Biscayne Bay voluntarily dismissed CalAtlantic before filing the fourth amended complaint in the Underlying Lawsuit, the fourth amended complaint cannot be the operative pleading for determining whether Auto-Owners had a duty to defend CalAtlantic until that point.

Underlying Complaint, CalAtlantic was the developer and general contractor for the Project. See id. ¶ 12. Environmental was a subcontractor responsible for installing the "building wrap, flashing, and building envelope waterproof system at all 24 buildings in the community." Id. ¶¶ 46, 278.

Biscayne Bay alleged that all of the various state court defendants "failed to reasonably and adequately plan, develop, design, or construct the Townhomes." Id. ¶ 90. As a result of the defendants' failures, Biscayne Bay asserted that the townhomes suffer from the following defects: "foundations; soils; site work; exterior wall and building envelope defects; waterproofing defects; concrete and flatwork defects; defects in the roofing systems, and cladding systems and related components; and the material and workmanship incident to their installation." Id. ¶ 91. In addition, Biscayne Bay alleged that the aggregate effect of the defects "has caused and will continue to cause, community-wide water-intrusion damage to other components of the roofs and other components of the building including, but not limited to the building exteriors, building framing, building lath, building sheathing, drywall, paint, interior and exterior finishes, erosion of soils, damages to concrete slabs, driveways, and walks, and damages to site work and other components of the Townhomes . . . ." Id. ¶¶ 95, 104, 112-13, 120-21, 279. Based in part on these allegations, Biscayne Bay brought three claims against CalAtlantic and two claims against Environmental. As to CalAtlantic, Biscayne Bay asserted claims for violation of Florida's building code (Count I), negligence (Count II), and breach of implied warranty (Count XLII). See Underlying Complaint at 22-27, 95-96. As to Environmental, Biscayne Bay asserted claims for negligence (Count III) and violation of Florida's building code (Count XIX). See id. at 27-29, 56-57.

Notably, in the Underlying Complaint, Biscayne Bay did not allege when the water damage actually occurred or when it was discovered. Instead, Biscayne Bay alleged only that "[t]he defects and deficiencies were not readily discoverable by [Biscayne Bay] or its members through reasonable inspection at the time of purchase, and [Biscayne Bay] and its members became aware of the defects and deficiencies only after inspections performed by expert consultants." Id. ¶ 94. Additionally, in the Underlying Complaint, Biscayne Bay did not allege when Environmental completed its work on the Project, when certificates of occupancy were issued for the townhomes, or when Biscayne Bay took possession of the townhomes.

**B.    The Policy**

Auto-Owners attached the commercial general liability (CGL) policy at issue as an exhibit to its Complaint for Declaratory Relief. See id., Ex. D: Commercial General Liability Insurance Policy Issued by Auto-Owners Insurance Company to Environmental House Wrap, Inc. (Doc. 1-4; Policy). Environmental is the named insured in the Policy and CalAtlantic is named as an additional insured. See Policy at 7-8.[7] The Policy provides coverage for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." See Policy at 8. For the insurance to apply, the "property damage" must be "caused by an 'occurrence' that takes place in the 'coverage territory.'" Id. An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Id. at 20. In addition, the "property damage" must "occur[ ] during the policy period." Id. at 8. The Policy defines "property damage," in relevant part, as "[p]hysical injury

---

[7] Because the Policy itself is not consecutively paginated, the Court will cite to the Policy using the page numbering assigned by the Court's CM/ECF docketing system.

to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it." Id. at 20-21. The Policy provides that Auto-Owners "will have the right and duty to defend the insured against any 'suit' seeking . . . damages for . . . "property damage." Id. at 8.

The Policy also provides products-completed operations hazard coverage to Environmental, which is defined in the Policy as follows:

> [PCOH] [i]ncludes all . . . "property damage" occurring away from premises you own or rent and arising out of . . . "your work" except:
>
> (1) Products that are still in your physical possession; or
>
> (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
>
> (a) When all of the work called for in your contract has been completed.
>
> (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
>
> (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
>
> Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

Id. at 20.

In relevant part, the Policy excludes coverage for:

> j. "Property damage" to:
>
> . . .

> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>
> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
>
> . . .
>
> Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."
>
> *l.* "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

Policy at 10-11. "Exclusion (*l*) is known as the 'your work' exclusion." Amerisure Mut. Ins. Co. v. Auchter Co., 673 F.3d 1294, 1298 (11th Cir. 2012) (internal citations omitted).

Endorsement Form 55202 adds CalAtlantic as an additional insured "only with respect to liability arising out of 'your work' [i.e. Environmental's work] for that insured [i.e. CalAtlantic] by or for you [i.e. Environmental]." Id. at 7. Significantly, the endorsement also includes a completed operations exclusion, which states that "[t]he insurance provided herein to the Additional Insured [CalAtlantic] does not apply to the 'products-completed operations hazard.'" Id. (emphasis added).

## II.   Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[8]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit

---

[8] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013).  Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

9

under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). Notably, the instant action is before the Court on cross-motions seeking summary judgment. "The principles governing summary judgment do not change when the parties file cross-motions for summary judgment." T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008). Instead, applying the same principles, "the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts." Id.

## III. Applicable Law

"Under Florida law, insurance contracts are 'construed according to their plain meaning, with any ambiguities construed against the insurer and in favor of coverage.'"[9] See Amerisure, 673 F.3d at 1301 (quoting U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 877 (Fla. 2007)). When construing an insurance policy, a court "'should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect.'" J.S.U.B., 979 So. 2d at 877 (quoting Auto-Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000)). However, "'[a] court cannot rewrite an insurance contract to extend coverage beyond what is clearly set forth in the contractual language.'" Szczeklik v. Markel

---

[9] This case is before the Court based on its diversity jurisdiction. See Complaint ¶¶ 2, 4-7. As such, the Court applies the substantive law of the forum state, Florida. See Auto-Owners Ins. Co. v. E.N.D. Servs., Inc., 506 F. App'x 920, 923 n.2 (11th Cir. 2013). The parties do not dispute that Florida law applies. See Auto-Owners' Motion at 11; Biscayne Bay's Motion at 5; CalAtlantic's Motion at 5 (each applying Florida law).

Int'l Ins. Co., 942 F. Supp. 2d 1254, 1260 (M.D. Fla. 2013) (quoting Fla. Residential Prop. & Cas. Joint Underwriting Ass'n v. Kron, 721 So. 2d 825, 826 (Fla. 3d Dist. Ct. App. 1998)). Although the insured bears the burden of proving that a claim is covered by the insurance policy, the "burden of proving an exclusion to coverage is . . . on the insurer." LaFarge Corp. v. Travelers Indemn. Co., 118 F.3d 1511, 1516 (11th Cir. 1997). However, if there is an exception to the exclusion, "the burden returns to the insured to prove the exception and show coverage." See Mid-Continent Cas. Co. v. Frank Casserino Constr., Inc., 721 F. Supp. 2d 1209, 1215 (M.D. Fla. 2010).

Additionally, Florida law instructs that an insurer's duty to defend is determined solely by the allegations in the underlying complaint. See Category 5 Mgmt. Grp., LLC v. Companion Prop. & Cas. Ins. Co., 76 So. 3d 20, 23 (Fla. 1st. Dist. Ct. App. 2011); see also Lawyers Title Ins. Corp. v. JDC (America) Corp., 52 F.3d 1575, 1580 (11th Cir. 1995). Ordinarily, "[c]overage is determined from examining the most recent amended pleading, not the original pleading." Trailer Bridge, 657 F.3d at 1142. "The duty arises when the relevant pleadings allege facts that 'fairly and potentially bring the suit within policy coverage.'" Lawyers Title Ins. Corp., 52 F.3d at 1580 (quoting Lime Tree Vill. Cmty. Club Ass'n v. State Farm Gen. Ins. Co., 980 F.2d 1402, 1405 (11th Cir. 1993)). The actual facts of the situation are not relevant, such that "the insurer must defend even if facts alleged are actually untrue or legal theories unsound." Id. As a result, "an insurer's duty to defend is distinct from, and broader than, the duty to indemnify." Sinni v. Scottsdale Ins. Co., 676 F. Supp. 2d 1319, 1323 (M.D. Fla. 2009). In addition, where a complaint "alleges facts partially within and partially outside the coverage of the policy, the insurer is obligated to defend the entire suit." Category 5 Mgmt. Grp., LLC, 76 So. 3d at 23. Significantly, "[i]f an

examination of the allegations of the complaint leaves any doubt regarding the insurer's duty to defend, the issue is resolved in favor of the insured." Lawyers Title Ins. Corp., 52 F.3d at 1580-81.

IV. **Analysis**

As noted above, the Court has already determined that Auto-Owners must defend Environmental in the Underlying Lawsuit. In doing so, the Court concluded that the Underlying Complaint sufficiently alleged "property damage," caused by the "occurrence" of Environmental's allegedly faulty workmanship. The Court additionally found that the Underlying Complaint included allegations of damage to property other than Environmental's own work. Specifically, the Underlying Complaint fairly alleged that Environmental's faulty installation of the building wrap, flashing, and a waterproof system caused water damage to other property—drywall, paint, interior and exterior finishes, and driveways—for which other subcontractors were responsible. Finally, the Court concluded that the Underlying Complaint could be fairly read to allege potentially covered property damages that occurred within the Policy period. Pursuant to the additional insured endorsement, CalAtlantic is also potentially covered for the claims against it relating to the alleged water damage caused by Environmental's faulty workmanship, unless the Court determines that the completed operations exclusion applies to preclude coverage.

Notably, in their Motions for summary judgment, Auto-Owners and Biscayne Bay agree that "[a] completed operations exclusion bars coverage for injuries that occur after the insured completed its work on a particular operation." See Auto-Owners' Motion at 15; Biscayne Bay's Motion at 15. The parties disagree, however, about whether the Underlying Complaint alleged damage that occurred during ongoing operations. Specifically,

Biscayne Bay argues that the completed operations exclusion did not bar coverage for CalAtlantic because the "Underlying Complaint will be considered to allege damage which occurred during ongoing and completed operations. Since the [ ] Underlying Complaint contains at least one allegation within the scope of coverage (i.e., claims for damages during ongoing operations) . . . Auto-Owners must defend [CalAtlantic] against the entire suit, even if it does not ultimately trigger the duty to indemnify." Biscayne Bay's Motion at 15 (citations omitted). In contrast, Auto-Owners argues that the completed operations exclusion bars coverage for the claims against CalAtlantic because the Underlying Complaint alleged that the damage caused by Environmental's faulty workmanship occurred after the Project was completed. See id. at 14-16. In making this argument, however, Auto-Owners improperly relies on an earlier complaint filed in the Underlying Action in which Biscayne Bay had alleged that the damages occurred after certificates of occupancy were issued for the townhomes. Id. However, that complaint has been superseded and, as the Court stated at the hearing, the operative Underlying Complaint does not allege when the damage occurred or when the Project was completed.

Perhaps recognizing the problems with the argument presented in its Motion, Auto-Owners presented an entirely different argument at the motion hearing, arguing for the first time that the timing of the damage is irrelevant for purposes of determining whether the completed operations exclusion applies. Specifically, Auto-Owners contends that "[t]he definition of 'products-completed operations hazard' focuses on the timing of completion of the work, not the timing of damages." Auto-Owners' Supplemental Brief at 6-7. "Because CalAtlantic is seeking coverage under the [Policy] after the work at the Project was completed and after the Project was put to its intended use," Auto-Owners asserts that "this

is a 'products-completed operation hazard,' and CalAtlantic is not entitled to coverage . . . ." Id. at 8.

Upon consideration, the Court finds Auto-Owners' proposed interpretation of the completed operations exclusion to be unreasonable. "A completed operations exclusion bars coverage <u>for [damages] that occur after the insured completed its work</u> on a particular operation." <u>J.S.U.B.</u>, 906 So. 2d at 308 (emphasis added). Thus, to determine whether the exclusion applies to a particular claim, the Court must necessarily consider when the project was completed in relation to when the damages occurred. Indeed, courts applying Florida law have consistently determined whether the completed operations exclusion applied by considering whether the damage occurred during ongoing operations. <u>See, e.g.</u>, <u>Sandpiper Constr. Co. Inc. v. United States Fidelity and Guar. Co.</u>, 348 So. 2d 379, 380 (Fla. 2d Dist. Ct. App. 1977) (affirming trial court's decision that completed operations exclusion barred coverage because "operations had been completed prior to collapse of the roof"); <u>Greenway Village South Condominium Ass'ns, Inc. v. Roach</u>, 397 So. 2d 954, 956 (Fla. 4th Dist. Ct. App. 1981) (holding completed operations exclusion did not bar coverage where "the insured negligently . . . damaged an existing structure before the project was completed"); <u>Auto-Owners Ins. Co. v. Marvin Dev. Corp.</u>, 805 So. 2d 888, 892 (Fla. 2d Dist. Ct. App. 2001) (holding completed operations exclusion "applied because the property damage occurred after Marvin Development completed construction of the residence"). See also <u>Great Divide Ins. Co. v. Amerisure Ins. Co.</u>, Case No. 2:17-cv-14271, 2018 WL 1318340, at *3 (S.D. Fla. Mar. 14, 2018) ("The determination of whether the Amerisure insurance policy covers completed operations is critical because it is undisputed that Mr. Henkle fell after Drawdy had completed its work."); <u>Cincinnati Ins. Co.</u>

v. Quorum Mgmt. Corp., 186 F. Supp. 3d 1307, 1323 (M.D. Fla. 2016) ("These facts clearly show that Franck's and Campbell completed production of their 'product' and completed their 'work' prior to the occurrence of any damages . . . .").

In support of its position, Auto-Owners relies heavily on Scottsdale Insurance Company v. Granada Insurance Company, 371 F. Supp. 3d 1130, 1140 (S.D. Fla. 2019), in which the district court held that

> [w]hen assessing completed-operations hazard exclusions . . ., the relevant timeframe under Florida law is when the project is completed, and not when latent damage may have occurred. Where a latent defect might have caused damages during the policy period, but the damage materializes after a project is complete and the site or product is put to its intended use, the completed-operations hazard exclusion bars coverage.

However, Scottsdale is not binding on this Court; nor is it persuasive given the authority cited above and in light of the Eleventh Circuit's recent decision in Southern-Owners Insurance Company v. MAC Contractors of Florida, LLC, 768 F. App'x 970, 973 (11th Cir. 2019).[10]  In MAC Contractors, Southern-Owners Insurance Company sought a declaratory judgment that it owed no duty to defend or indemnify its insured, KJIMS Construction, against a state-court lawsuit brought by Paul and Deborah Doppelt. Id. at 971.  KJIMS served as general contractor for the construction of a residence for the Doppelts. Id. "Problems arose between KJIMS and the Doppelts after construction began, and KJIMS eventually left the job site before completing the project and before the issuance of a certificate of occupancy." Id.  The Doppelts subsequently sued KJIMS in state court claiming, among other things, "'damage to wood floors and the metal roof' that KJIMS had

---

[10] "Although an unpublished opinion is not binding . . ., it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

15

failed to remediate despite its assurances that the damages would be repaired." Id. Southern-Owners argued, and the district court agreed, that it had no duty to defend KJIMS in the underlying action in light of the policy's Your Work exclusion, which precluded coverage for property damage to KJIMS's work and included in the products-completed operations hazard. Id. at 971-72. In other words, for the Your Work exclusion to apply, the property damage must have occurred after the work was completed or abandoned. Id. at 973. On appeal, "KJIMS argue[d] that the district court erred because the underlying complaint [was] silent as to the timing of damages and [could] reasonably be construed to allege 'property damage' occurring during ongoing operations—that is, before KJIMS abandoned the project." Id. at 972-73. KJIMS maintained that "property damage occurring before the work is 'completed' or 'abandoned' is not included in the 'products-completed operations hazard' and, as a result, falls outside the Your Work exclusion." Id. at 973.

In determining whether the Your Work exclusion applied, the Eleventh Circuit observed that "'[p]roperty damage occurs when the damage happens, not when the damage is discovered or discoverable.' And where the underlying allegations, even though silent as to the timing of damages, can be reasonably construed to allege property damage that occurred during the policy period, 'there is a potential for coverage.'" Id. (quoting Carithers v. Mid-Continent Cas. Co., 782 F.3d 1240, 1247 (11th Cir. 2015); Trizec Properties, Inc. v. Biltmore Const. Co., 767 F.2d 810, 813 (11th Cir. 1985)). The court ultimately concluded that

> although the underlying allegations are silent as to the timing of the damages, the allegations can be reasonably construed to allege damages that occurred during ongoing operations. In particular, the Doppelts alleged "damage to wood floors and the metal roof" that KJIMS had failed to remediate despite its assurances that the damages would be fixed. It is reasonable to infer from

> this allegation that KJIMS had promised to remediate the damage to the wood floors and metal roof before it abandoned the project.

MAC Contractors, 768 F. App'x at 973. "Construing the Your Work exclusion narrowly and resolving all doubts in favor of KJIMS," the court held "that the underlying allegations [could] fairly be construed to allege damages during ongoing operations." Id. (citations omitted).

Applying the principals articulated by the court in MAC Contractors to the instant case, the Court finds that the completed operations exclusion does not bar coverage for CalAtlantic. Auto-Owners argues that the exclusion precludes coverage because the Underlying Complaint "alleges that the townhomes were put to their intended use (purchased and occupied) and, after that, the deficiencies were found by unit owners who purchased the home[s]. It was not until 2016, over seven years after the last townhome was completed in 2008, that the claim was made and [the] lawsuit was filed." Id. at 8-9. However, "[p]roperty damage occurs when the damage happens, not when the damage is discoverable or discovered."[11] Carithers, 782 F.3d at 1247. Here, the Underlying Complaint alleges that "[t]he defects and deficiencies were not readily discoverable by

---

[11] The Eleventh Circuit has applied the injury-in-fact trigger three times in the context of similar, occurrence-based CGL policies and latent damages for purposes of determining whether the damage occurred during the policy period or during ongoing operations. See Carithers, 782 F.3d at 1247; Trizec, 767 F.2d at 813; see also MAC Contractors, 768 F. App'x at 973. The Court recognizes, however, that the Eleventh Circuit explicitly limited its holdings in Carithers and Trizec to the specific terms of the policies and facts before it in those cases. See Carithers, 782 F.3d at 1247; Trizec, 767 F.2d at 813. Significantly, the court in Carithers recognized "the difficulty that may arise, in cases such as this one, where the property damage is latent, and is discovered much later," but noted that the district court had made a factual finding that the property in that case was damaged in 2005. 782 F.3d at 1247. Accordingly, the Eleventh Circuit "express[ed] no opinion on what the trigger should be where it is difficult (or impossible) to determine when the property was damaged." Id. The Court also recognizes that Biscayne Bay's allegations in the Underlying Complaint regarding when the water damage occurred are even more vague than those in MAC Contractors. Nevertheless, in the absence of controlling (or persuasive) authority suggesting that the Court should apply the manifestation trigger (or some other test) to determine whether the alleged damages occurred during ongoing operations in the instant case, the Court will apply the injury-in-fact trigger.

17

[Biscayne Bay] or its members through reasonable inspection at the time of purchase, and [Biscayne Bay] and its members became aware of the defects and deficiencies only after inspections performed by expert consultants."[12] Id. ¶ 94. Biscayne Bay does not allege in the Underlying Complaint when Environmental's allegedly faulty workmanship began to physically damage the townhomes. Moreover, the Underlying Complaint does not even allege when Environmental completed its work.[13] Thus, based on the allegations of the Underlying Complaint, the damage could have occurred any time after commencement of construction and before the inspection, thereby potentially including ongoing operations. While the allegation that the defects were not discovered, or capable of discovery, until the inspection, could mean that the property damage occurred long after Environmental completed its work on the Project, this is not the only possible inference. The allegations could also, "at least marginally and by reasonable implication," refer to water damage that began years before the inspection, but were not discovered, or were discovered but not

---

[12] The Limited Condition Survey Summary Report attached to the original state court complaint shows that the expert consultants performed their inspections on January 19, 2016. However, Biscayne Bay did not attach the report to its amended complaints in the Underlying Lawsuit. In any event, the report does not contain any information from which the Court could discern when the alleged property damage occurred.

[13] As an exhibit to its Supplemental Brief, Auto-Owners submitted certificates of occupancy issued for the townhomes. See Auto-Owners' Supplemental Brief, Ex. A (Doc. 81-1). Significantly, Auto-Owners makes no attempt to establish that it is appropriate for the Court to consider this extrinsic evidence in its analysis of the duty defend by citing to relevant Florida law recognizing the narrow circumstances where a court may consider evidence extrinsic to the underlying complaint when determining the duty to defend. See, e.g., Higgins v. State Farm Fire & Cas. Co., 894 So. 2d 5, 10 n.2 (Fla. 2005) (identifying "some natural exceptions" to the principal that the obligation to defend is determined solely by the underlying complaint "where an insurer's claim that there is no duty to defend is based on factual issues that would not normally be alleged in the complaint"). See also Composite Structures, Inc. v. Cont'l Ins. Co., 560 F. App'x 861, 865 (11th Cir. 2014); First Specialty Ins. Corp. v. 633 Partners, Ltd., 300 F. App'x 777, 785 (11th Cir. 2008). In any event, the Court finds it inappropriate to consider this evidence because, among other reasons, Biscayne Bay has not alleged in the operative Underlying Complaint that the damage occurred after the certificates of occupancy were issued.

indicative of construction defects, until later.[14]  See Trizec, 767 F.2d at 813.  Because the Court is required to resolve any doubts as to a duty to defend in favor of the insured, see Lawyers Title Ins. Corp., 52 F.3d at 1580-81, and because an insurer must defend if the allegations against the insured allege facts potentially and even only partially within coverage, see Category 5 Mgmt. Grp., LLC, 76 So. 3d at 23, the Court determines that Auto-Owners had a duty to defend CalAtlantic in the Underlying Lawsuit.

Accordingly, it is **ORDERED**:

1. Auto-Owners Insurance Company's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 47) is **DENIED** to the extent Auto-Owners seeks a declaration that it did not have a duty to defend CalAtlantic in the Underlying Lawsuit.

2. CalAtlantic Group, Inc.'s Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 44) and Biscayne Bay Homeowners Association, Inc.'s Motion for Partial Summary Judgment Against Auto-Owners Insurance Company and Memorandum of Law in Support Thereof (Doc. 46) are **GRANTED** to the extent the Court declares that Auto-Owners had a duty to defend CalAtlantic in the Underlying Lawsuit.

3. The issue of Auto-Owners' duty to indemnify is **STAYED** pending the completion of the Underlying Litigation.  The **Clerk of Court** is directed to terminate any pending motions and administratively close the file pending further order of the Court.

---

[14] To the extent Auto-Owners is suggesting that Biscayne Bay was required to notify Auto-Owners of the damage during ongoing operations, the Court finds such an argument to be without merit.  Indeed, such a requirement would essentially convert the Policy from an occurrence-based policy, which covers claims for damage that occur during the policy term irrespective of when the claims are actually asserted against the insured, to a claims-made policy, which only covers claims "brought to the attention of the insurer within the policy term[.]"  Trizec, 767 F.2d at 812 n.3.

4. The parties shall file a joint status report upon the conclusion of the Underlying Lawsuit. If the Underlying Lawsuit has not been resolved by **November 7, 2019**, then the parties shall file a joint status report at that time and every 90 days thereafter until the Underlying Lawsuit is completed.

5. Pursuant to Rule 54(b), finding that there is no just reason to delay the entry of final judgment on the issue of Auto-Owners' duty to defend, the **Clerk of Court** is directed to enter final partial judgment in favor of Defendant Biscayne Bay Homeowners Association, Inc., and against Plaintiff Auto-Owners Insurance Company, declaring that Auto-Owners Insurance Company has a duty to defend Environmental House Wrap, Inc. in the Underlying Lawsuit and that Auto-Owners Insurance Company had a duty to defend CalAtlantic Group, Inc. in the Underlying Lawsuit before the parties settled.[15]

**DONE AND ORDERED** in Jacksonville, Florida on July 12, 2019.

*[signature]*
MARCIA MORALES HOWARD
United States District Judge

lc23
Copies to:
Counsel of Record

---

[15] Because the Court has stayed the issue of Auto-Owners' duty to indemnify pending the outcome of the Underlying Lawsuit, the Court finds that the balance of judicial administrative interests and the relevant equitable concerns weigh in favor of Rule 54(b) certification. See Ebrahimi v. City of Huntsville Bd. of Educ., 114 F.3d 162, 166 (11th Cir. 1997).